FILED
2016 Mar-21  PM 04:20
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
JASPER DIVISION**

| | |
|---|---|
| **RHONDA L. NICHOLS,** ) | |
| ) | |
| **Claimant,** ) | |
| ) | |
| **v.** ) | **CIVIL ACTION NO.** |
| ) | **6:14-CV-02010-KOB** |
| **CAROLYN W. COLVIN,** ) | |
| **ACTING COMMISSIONER OF** ) | |
| **SOCIAL SECURITY,** ) | |
| ) | |
| **Respondent.** ) | |

**MEMORANDUM OPINION**

**I. INTRODUCTION**

On November 21, 2011, the claimant, Rhonda Nichols, protectively applied for a period

of disability, disability insurance benefits, and Supplemental Security Income, alleging that she

was disabled beginning October 26, 2009 because of back pain. (R. 130-31, 209-21). The Social

Security Administration denied the claimant's applications. (R. 150-59).

The claimant requested a hearing, and an Administrative Law Judge ("ALJ") held a

hearing on February 4, 2013. (R. 35-96, 160-62). Thereafter, the ALJ found the claimant not

disabled in a decision dated April 23, 2013. (R. 5-27). The claimant requested that the Appeals

Council review the decision. (R. 33). The Appeals Council denied the request on September 15,

2014. Consequently, the ALJ's decision became the final decision of the Commissioner of the

Social Security Administration. (R. 1-6).

The claimant appeals from the final decision denying her claims. The claimant has

exhausted her administrative remedies, and this court has jurisdiction pursuant to 42 U.S.C. §§

1

405(g) and 1383(c)(3). For the reasons stated below, this court AFFIRMS the decision of the Commissioner.

## II. ISSUES PRESENTED

The claimant presents the following issues for review:

1.    whether ALJ properly concluded that the claimant's impairments, singly or in combination, did not meet the criteria for listing 12.05(B) or (C);

2.    whether the claimant's back impairment imposed greater limitations than the ALJ's residual functional capacity ("RFC") finding;

3.    whether the ALJ properly assigned weight to the opinions of Dr. Prevost; and

4.    whether the ALJ properly assessed the claimant's impairments in combination when finding her not disabled.

## III. STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited. This court must affirm the Commissioner's decision if she applied the correct legal standards and if substantial evidence supports her factual conclusions. *See* 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No . . . presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims.*" Walker*, 826 F.2d at 999. This court does not review the Commissioner's factual determinations *de novo*. The court will affirm those factual determinations that are supported by substantial evidence. "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402

2

U.S. 389, 402 (1971).

The court must keep in mind that opinions such as whether a claimant is disabled, the nature and extent of a claimant's residual functional capacity, and the application of vocational factors "are not medical opinions, . . . but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability." 20 C.F.R. §§ 404.1527(d), 416.927(d). Whether the claimant meets the listing and is qualified for Social Security disability benefits is a question reserved for the ALJ, and the court "may not decide facts anew, reweigh the evidence, or substitute [its] judgment for that of the Commissioner." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). Thus, even if the court were to disagree with the ALJ about the significance of certain facts, the court has no power to reverse that finding as long as substantial evidence in the record supports it.

The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner]'s factual findings." *Walker*, 826 F.2d at 999. A reviewing court must not only look to those parts of the record that support the decision of the ALJ, but also must view the record in its entirety and take account of evidence that detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

## IV. LEGAL STANDARD

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the person is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42

U.S.C. § 423(d)(1)(A). To make this determination the Commissioner employs a five-step,

sequential evaluation process:

> (1) Is the person presently unemployed?
> (2) Is the person's impairment severe?
> (3) Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?
> (4) Is the person unable to perform his or her former occupation?
> (5) Is the person unable to perform any other work within the economy?
>
> An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986)[1]; 20 C.F.R. §§ 404.1520, 416.920.

In evaluating pain and other subjective complaints, the Commissioner must consider

whether the claimant demonstrated an underlying medical condition, and *either* (1) objective

medical evidence that confirms the severity of the alleged pain arising from that condition *or* (2)

that the objectively determined medical condition is of such a severity that it can reasonably be

expected to give rise to the alleged pain. *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991).

The ALJ may consider the claimant's daily activities in evaluating and discrediting complaints of

disabling pain. *Harwell v. Heckler*, 735 F.2d 1292, 1293 (11th Cir. 1984).

If the ALJ decides to discredit the claimant's testimony as to her pain, he must articulate

explicit and adequate reasons for that decision; failure to articulate reasons for discrediting

claimant's testimony requires that the court accept the claimant's testimony as true. *Foote v.*

---

[1]*McDaniel v. Bowen*, 800 F.2d 1026 (11th Cir. 1986) was a supplemental security income case (SSI). The same sequence applies to disability insurance benefits. Cases arising under Title II are appropriately cited as authority in Title XVI cases. *See*, *e.g.*, *Ware v. Schweiker*, 651 F.2d 408 (5th Cir. 1981) (Unit A).

*Chater*, 67 F.3d 1553, 1561-62 (11th Cir. 1995). A reviewing court will not disturb a clearly articulated credibility finding with supporting substantial evidence in the record. *Id.* at 1562.

To meet Listing § 12.05 for "mental retardation," the claimant must have "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22." Listing § 12.05; see also *Perkins v. Comm'r, Soc. Sec. Admin.*, 553 F. App'x 870, 2014 WL 223905 at *2 (11th Cir. 2014) (quoting *Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997)).

To meet the required level of severity in § 12.05(B), the claimant must show "[a] valid verbal, performance, or full scale IQ of 69 or less[.]" To meet the required level of severity in § 12.05(C), the claimant must show "[a] valid verbal, performance, or full scale IQ of 60 to 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function[.]" The additional mental or physical impairment must have more than a "'minimal effect' on the claimant's ability to perform basic work activities." *Smith v. Comm'r of Soc. Sec.*, 535 F. App'x 894, 897 (11th Cir. 2013) (emphasis added) (quoting *Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992)).

Because the IQ score is essential in evaluating § 12.05, the Eleventh Circuit provides guidance for an ALJ in how to properly consider an IQ score. The Eleventh Circuit established that a valid IQ score of 60 to 70 creates a rebuttable presumption of "a fairly constant IQ score throughout [his or] her life[,] absent evidence of sudden trauma that can cause retardation," thus, indicating that the deficits in adaptive functioning manifested before the age of twenty-two. *Hodges v. Barnhart*, 276 F.3d 1265, 1268-69 (11th Cir. 2001).

5

However, in *Popp v. Heckler*, the Eleventh Circuit held that "[t]he ALJ is required to examine the results [of an IQ test] in conjunction with *other medical evidence and the claimant's daily activities and behavior*"; an IQ score alone is not conclusive evidence of a mental disability. 779 F.2d 1497, 1499-1500 (11th Cir. 1986) (emphasis added). The ALJ should look to the narrative report that accompanies the IQ test results, as it "should comment on whether the IQ scores are considered valid and consistent with the developmental history and the degree of functional limitation." Listing § 12.00(D)(6)(a).

Social Security Ruling 96-8p provides guidance regarding residual functional capacity assessments: The RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions in paragraphs (b), (c), and (d) of 20 C.F.R. §404.1545 and §416.945. Only after that may RFC be expressed in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy. SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996).

The ALJ must consider all of the relevant evidence in assessing the claimant's functional limitations, including medical history, medical signs and laboratory findings, the effects of treatment, including limitations or restrictions imposed by the mechanics of treatment (e.g., frequency of treatment, duration, disruption to routine, side effects of medication), reports of daily activities, lay evidence, recorded observations, medical source statements, effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment, evidence from attempts to work, need for a structured living environment, and work evaluations, if available. SSR 96-8p at *4-*5, 1996 SSR LEXIS 5 at *13-*14.

However, the ALJ is not required to "specifically refer to every piece of evidence in his

decision," so long as the decision is sufficient to show that the ALJ considered the claimant's medical condition as a whole. *Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir.2005); *see also Castel*, 355 F. App'x at 263.

Absent a good showing of cause to the contrary, the ALJ must accord substantial or considerable weight to the opinions of treating physicians. *Lamb v. Bowen*, 847 F.2d 698, 703 (11th Cir. 1988). The ALJ must credit the opinions of treating physicians over those of consulting physicians unless good cause exists for treating the opinions differently. *Lewis v. Callahan*, 125 F.3d 1436, 1440-41 (11th Cir. 1997).

The ALJ may discount a treating physician's report when it is not accompanied by objective medical evidence or is wholly conclusory. *Crawford v. Commissioner*, 363 F.3d at 1159. Where the ALJ articulated specific reasons for failing to give the opinion of a treating physician controlling weight and those reasons are supported by substantial evidence, the ALJ commits no reversible error. *Moore v. Barnhart*, 405 F.3d 1208, 1212 (11th Cir. 2005).

When a claimant has alleged several impairments, the ALJ has a duty to consider the impairments in combination and to determine whether the combined impairments render the claimant disabled. *Jones v. Dep't of Health & Human Servs.*, 941 F.2d 1529, 1533 (11th Cir. 1991). The ALJ can satisfy his duty to consider all of the impairments in combination by "stating that he considered whether the claimant suffered from any impairment or combination of impairments." *Id*; *see also Wilson v. Barnhart*, 284 F.3d 1219, 1224-25 (ALJ's decision stating claimant did not have an impairment or combination of impairments that met a listed impairment constituted evidence that the ALJ considered the plaintiff's impairments); *Wheeler v. Heckler*, 784 F.2d 1073, 1076 (11th Cir. 1986) (holding the ALJ clearly considered impairments in

combination where he concluded that claimant "[was] not suffering from any impairment, or a combination of impairments of sufficient severity to prevent him from engaging in any substantial gainful activity for a period of at least twelve continuous months").

## V. FACTS

The claimant was 42 years old on the date of the ALJ's decision. (R. 27, 209). The claimant completed high school and had past relevant work as a cook helper and a hospital cleaner. (R. 44-49, 85, 256). The claimant reported that she became unable to work because of lower back pain. (R. 256). The claimant alleged she was disabled beginning October 26, 2009. (R. 130).

*Physical Impairments*

Prior to the alleged onset date of October 26, 2009, the claimant visited a local emergency room ("ER") at Walker Baptist Medical Center several times with complaints of random ailments.[2] With all the history taken, the claimant never mentioned any musculoskeletal difficulties. (R.372-80).

The claimant visited the ER again on October 27, 2009 with complaints of lower back pain, secondary to a work injury. A review of systems and her past medical history were otherwise unremarkable. The physical examination did not reveal any acute distress; however,

---

[2]On July 12, 2009, the claimant complained of abdominal pain, and the doctor diagnosed her with urinary tract infection; on August 18, 2009, the claimant complained of cough and reported a history of bronchitis, and the doctor treated her with acute bronchitis and viral syndrome; on October 4, 2009, the claimant complained of headache and reported a history of chronic headaches and migraines; on October 12, 2009, the claimant complained of cough, fever, sore throat, and flu, and the doctor diagnosed her with bronchitis and influenza; and on October 20, 2009, the claimant complained again of cough, fever, and chills, ultimately the doctor diagnosed the claimant with bronchitis and dyspnea (difficult or labored breathing). (R. 372-80).

the claimant had lower back muscle spasms. The claimant also displayed signs of depressed mood and affect. The x-ray examination revealed significant degenerative changes at the L4-5 and L5-S1 facets with discogenic degenerative changes at L5-S1, as well as mild sclerotic degenerative changes in both sacroiliac joints. Ultimately, the ER doctor treated the claimant with a Toradol injection[3] and prescriptions for pain. (R. 367-69).

On November 4, 2009,  the claimant met with an orthopedic specialist, Dr. Mark A. Prevost at Southern Orthopedic & Sports Medicine Associates. The visit was a worker's compensation visit. The claimant reported to Dr. Prevost that she fell off a stool against a pole on October 27, 2009, one day after the alleged onset date. She reported right-sided lower back and thigh pain. As to past medical history, she reported "no major medical problems." (R. 289).

The claimant reported past surgical history involving her right ankle, bladder, and hysterectomy. Her physical examination revealed decreased range of motion of the lumbar spine; increased pain with left lateral bending; five out of five lower extremity motor strength; one plus and symmetrical reflexes; intact bilateral sensation; negative straight leg raise; negative Babinski[4]; negative Clonus[5]; and palpable pulse. Dr. Prevost ordered and reviewed x-rays of the claimant's lumbar spine. The test revealed some mild lumbar scoliosis and some degenerative changes throughout her lumbar spine, and the claimant's lordotic curve was normal with some indication that she was slightly hyperlordotic. Dr. Prevost diagnosed the claimant with some

---

[3]Toradol treats pain and inflammation caused by arthritis, menstrual cramps, and other medical problems.

[4]Babinski is an important neurologic examination based upon what the big toe does when the sole of the foot is stimulated. If the big toe goes up (i.e., positive), that may mean trouble.

[5]Clonus is a series of muscular spasms involving repeated, often rhythmic, contractions.

contusion; lower back pain; and lumbar scoliosis. He ordered an MRI examination. As to work activity, he reported that "we will keep her at light sedentary duty until we see the MRI scan results." (R. 289).

The MRI examination on November 23, 2009 revealed moderate foraminal stenosis at L4-5 and L5-S1; fairly significant degenerative changes at L5-S1, including the facet joints posteriorly; and some edema in the right S1 pedicle. Dr. Prevost diagnosed the claimant with lumbar stenosis. He elected to treat her with two lumbar epidural injections. Dr. Prevost advised that, after the first injection, he would put her back to work at light duty. He further advised that, after the second injection and follow-up two weeks thereafter, the plan was to put her back to work at full duty. (R. 288).

On January 11, 2010, the claimant reported to Dr. Prevost that the first injection was helpful; however, the second injection was not. She also reported that she was unable to work. However, Dr. Prevost reported that, although she tried to go back to work, her employer "did not have any work for her at light duty." He referred her to physical therapy for four weeks, with two visits per week. He also elected to keep her off from work until after completion of physical therapy. (R. 287).

On February 2, 2010, the claimant returned to Dr. Prevost and reported that she was still having a lot of pain. Dr. Prevost still believed that, at that time, she could return to light work without prolonged standing. However, he noted that if she could not tolerate light work, then he would recommend decompression and fusion treatment. (R. 285.)

On March 12, 2010, the claimant advised Dr. Prevost that she was unable to work. However, Dr. Prevost did not share her position. He recommended against surgery and returned

her to full duty with five percent of whole-person disability based on American Medical Association Guidelines to Evaluation of Permanent Impairment. He also advised the worker's compensation contact that he imposed no work restrictions. (R. 285, 465, 477).

On May 14, 2010, the claimant returned for a follow-up visit and reported that she continued to have terrible back pain and right leg pain. Dr. Prevost reviewed the claimant's updated x-rays and concluded that, secondary to pain, the claimant may be unable to return to work. However, he noted that limitation was secondary to longstanding degenerative scoliosis and arthritis and not her injury. He prescribed Soma and directed her to return for follow-up care as needed.  (R. 284).

On May 18, 2010, the claimant visited her local ER with complaints of lower back pain. A review of systems was otherwise unremarkable. Her past history revealed chronic headaches and chronic back pain. The claimant returned to the ER on July 25, 2010, and complained of lower back pain that began three days earlier. The ER doctor treated her with medication while at the ER; and prescribed her Lortab and Soma. (R. 356, 358).

The claimant sought no medical care until November 20, 2010, the day before she applied for disability, when she received treatment from Dr. Scott H. Boswell at Boswell Family Medicine. The claimant completed several subjective reports. In her initial pain assessment report, she advised that walking and lifting aggravated her condition. The report form specifically asked her to assess her limitation in standing, and she did not report any difficulty, nor did she list any additional aggravating factors. The claimant further reported that her back condition interfered with general activity, mood, normal work routine, interacting with others, sleeping, enjoying life, and appetite at a level seven and eight. (R. 412-414).

11

The claimant visited Dr. Boswell again three days later on November 23, 2010, complaining of lower back pain. The physical examination was unremarkable. Dr. Boswell did not report signs for any impairment. He diagnosed the claimant with lower back pain, dyspepsia, fatigue; and ordered an urine screen. Dr. Boswell directed the claimant to hot and cold pack therapy. On February 15, 2011, Dr. Boswell noted lumbar spasms and tenderness; the objective report was otherwise negative. (R. 387, 397, 403-04).

The claimant visited Dr. Boswell on March 15, 2011, complaining of lower back pain. Dr. Boswell examined the claimant and did not report any objective signs for any impairment. He diagnosed the claimant with lower back pain, migraine, and urinary tract infection. Dr. Boswell treated the claimant with Zanaflex, Zoloft, Mobic, and Macrobid.[6] (R. 393-94).

The claimant visited Dr. Boswell again on April 14, 2011. She reported persistent lower back pain. Dr. Boswell examined the claimant and objectively noted mild lumbar spasms. He diagnosed the claimant with lower back pain, migraine, insomnia, anxiety, and depression. (R. 386).

At the request of the DDS, the claimant presented for a disability examination on January 2, 2012 by an internist, Dr. Hasmukh Jariwala, at which she complained of lower back pain that had progressively gotten worse. The claimant reported constant pain that became sharp on exertion and radiated down the right hip and leg to the right knee all the time; joint stiffness for two to three hours in the morning; and pain with standing up after bending over. The claimant also reported that she could lift five to ten pounds. The medical examination revealed normal

---

[6]Zanaflex treats muscle spasms. Mobic treats symptoms of osteoarthritis and rheumatoid arthritis. Zoloft is an SSRI that treats depression, anxiety, and other disorders. Macrobid treats urinary tract infections caused by bacteria.

results in gait; motor and sensory system; and deep tender reflexes in upper and lower extremities.  Dr. Jariwala opined that the claimant had mild to moderate impairment in her lumbar spine; and no impairment in the rest of the peripheral joints nor in her cervical spine. In addition, Dr. Jariwala noted "[t]here is no evidence of any muscle spasm." (R. 420-23).

*Mental Impairments*

Prior to the alleged onset date of October 26, 2009, the claimant visited a local ER at Walker Baptist Medical Center several times with complaints of random ailments. With all the history taken, the claimant only mentioned symptoms of depression. (R.372-80).

During her visit to Dr. Boswell on November 20, 2010, the claimant completed a mood disorder questionnaire. She reported moderate limitation in anxiety, and depression. However, she reported no difficulty with spending money, racing thoughts, concentration, or ability to speak. The claimant also responded that she experienced no difficulty in the following: working, taking care of things at home, or getting along with other people. Subsequently on November 23, 2010, Dr. Boswell diagnosed the claimant with anxiety and depression. (R. 393-94, 415-16).

Referred by her attorney, the claimant went to Dr. Alan D. Blotcky, PhD for a psychological evaluation on January 15, 2013. Dr. Blotcky reported that the claimant spent most of her time doing light housework, preparing simple meals, and watching television. He also reported that the claimant enjoyed crochet; had obtained a driver's license via an oral exam; visited with her brother and sister on a regular basis; and talked to one friend on the telephone. (R. 484).

Dr. Blotcky reported in the mental exam that the claimant demonstrated logical and orderly thinking; that her thought process were concrete and simplistic; that her speech was

sparse; that her abstract thinking was poor; and that her memory functioning was intact but somewhat vague. Dr. Blotcky further stated that the claimant seemed depressed; however, she was not psychotic and did not have a thought disorder. He described the claimant's judgment as grossly intact, and her insight as fair. (R. 485).

In addition, Dr. Blotcky administered WAIS-IV, a psychological test, to the claimant and she obtained a Verbal Comprehension Index of 61, a Perceptual Reasoning Index of 65, a Working Memory Index of 66, a Processing Speed Index of 71, and a Full Scale IQ of 59. Dr. Blotcky concluded that these scores placed the claimant in the Mildly Retarded range of intellectual abilities. (*Id.*)

Dr. Blotcky also completed a medical source opinion. He found the claimant to have moderate difficulties in the following activities: responding appropriately to co-workers and maintaining social functioning. He found the claimant to have marked difficulties in the following activities: responding appropriately to supervisors; using judgment in simple, one or two step, work-related decisions; dealing with changes in a routine work setting; understanding, remembering, and carrying out simple, one or two-step, instructions; responding to customary work pressures; maintaining attention, concentration or pace for periods of at least two hours; and maintaining activities of daily living. He also found the claimant to have extreme difficulties in the following activities: responding appropriately to customers or other members of the general public; using judgment in detailed or complex work-related decisions; and understanding, remembering, and carrying out detailed or complex instructions. (R. 488-89).

*The ALJ Hearing*

At the hearing before the ALJ on February 4, 2013, the claimant reported past work in a

14

nursing home in housekeeping, doing laundry; and at various fast food and steakhouse restaurants as a salad maker, fast food cook, and dish washer. The claimant's attorney stated that the claimant is no longer able to do her prior work because of her back injury.  (R. 35, 44-47, 50).

The claimant testified that her back limits her activities because the following activities cause pain: bending over; standing for too long; and walking. The claimant reported shooting pains from her waist down her right leg. The claimant testified that the process of getting out of bed requires fifteen to twenty minutes in the morning, and some mornings she does not feel like getting out of bed at all. (R. 77-78).

The claimant further testified that her back also affects her ability to sit and walk. She testified that, on a bad day, she lies down four to five hours during the day; on a normal day, she would have to lie down three to four hours during the workday. The claimant estimated that she can only sit for about ten minutes at one time, stand for about ten minutes at a time, and walk for ten to fifteen minutes. The claimant rated her pain as a six or seven on the pain scale with taking medications; without medications, her pain rates a ten. The claimant then testified that she wakes up during the night about five times, walking and pacing the floors; however, she did not elaborate the reason why she cannot stay asleep. In addition, the claimant testified that she feels like giving up some days, and does not want to get out of bed because she is depressed and cries all the time. (R. 77, 79-81).

The claimant testified that she has had a driver's license since age sixteen or seventeen, but she was administered the oral test because she could not take a written test; that she received a certificate for completing twelfth grade; and that she attended special education the entire time she was in school. (R. 58-60).

15

As to her daily activities, the claimant testified that her sister helps her with her money and spelling words; that her sister pays bills for her and goes with her to the grocery store to make sure that she gets what she needs; and that she purchased a vehicle with her sister's assistance. In terms of helping her children with schoolwork, the claimant testified that she did what she could with simple reading. (R. 69, 73, 75, 76).

The vocational expert testified that the claimant's past work was consistent with her jobs as a cook helper (medium/unskilled/SVP2) and hospital cleaner (medium/unskilled/SVP2). The VE testified that, based on the description of the claimant's past relevant work as in the medium range of exertion, she would not be able to perform any of her past relevant work. (R. 85-87).

The VE further testified that representational jobs or other jobs exist in the local or national economies that an individual with the claimant's vocational profile would be able to perform with her limitations, such as cleaner, housekeeping, agricultural products sorter, and laundry sorter. The ALJ asked the VE to assume that the hypothetical individual is also limited to sedentary work. The VE testified that such an individual could perform jobs of food and beverage order clerk, final assembler of optical goods, and table worker. (R. 87-90).

In a hypothetical question, the ALJ asked the VE to consider the opinion of a doctor who found that the individual would suffer marked limitations in her ability to understand, remember, and carry out simple one to two-step instructions and marked limitations in her ability for concentration or pace for periods of at least two hours. The VE responded that if the hypothetical individual had either one of those limitations, no jobs would be available. (R. 91).

In another hypothetical question, the ALJ asked the VE to assume that the individual suffered from pain to the extent that, even if she had no specific mental disorder, she could not

16

maintain concentration, persistence, or pace for two-hour periods or attend to customary work pressures, based on pain. The VE responded that no work existed for such an individual. (*Id.*).

The ALJ also asked the VE to assume that a person had to lie down at least three to four hours per work day; sit down no longer than ten to fifteen minutes at a time; stand ten minutes at a time; and walk no longer than ten to fifteen minutes at a time. The VE responded that the first limitation of needing to lie down four to five hours a day, three to four days a week, would preclude all work. (R. 93).

*The ALJ Decision*

On April 23, 2013, the ALJ issued a decision finding that the claimant was not disabled under the Social Security Act. The ALJ followed the five-step sequential evaluation process for determining whether a claimant is disabled under §§ 404.1520, 416.920. (R. 5, 9-26).

At step one, the ALJ found that the claimant met the insured status requirements of the Social Security Act through September 30, 2011, and had not engaged in substantial gainful activity since the alleged onset date of October 26, 2009. (R. 10).

At step two, the ALJ found that the claimant had the severe impairments of degenerative disc disease (including spondylosis and stenosis, and scoliosis of the lumbar spine, aggravated by fall from a seated position on a stool), obesity, depressive disorder, and possible borderline intellectual functioning versus mild mental retardation. (*Id.*).

At step three, the ALJ found that the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments, including the listings in 1.02A, 1.04, 12.02, 12.04, 12.05, and 12.06. Specifically, the ALJ found the claimant did not meet 12.05(B), which requires an IQ score of 69 or less, because the ALJ did

17

not consider the claimant's IQ score of 59 to be valid. Therefore, the ALJ also found the claimant did not meet 12.05(C) because the first prong of 12.05(C) requires a valid IQ score in the 60-70 range. The ALJ did not believe the scores were valid because the claimant's history of adaptive functioning was not consistent with the degree of limitation suggested by the scores. (R. 11-14).

For example, the ALJ noted that despite her significant list of mood/emotional difficulties, the claimant reported no difficulty in working, taking care of things at home, or getting along with other people in one of her subjective reports to Dr. Boswell. The ALJ also noted that, in her December 2011 disability report, the claimant reported that she could read and understand English, and that she completed the twelfth grade. She did not report any emotional or learning difficulties. (R. 19-20).

The ALJ stated that the claimant's initial subjective report contained nothing to suggest that she suffered any significant emotional or learning difficulties. Additionally, the ALJ pointed out that the treatment record contained very little evidence of emotional difficulty – those that did exist were listed as mostly secondary to her physical impairments per her reports to various doctors – and no evidence of any cognitive or intellectual difficulties. Even though the records did show that the claimant received special education, the ALJ noted that the claimant received a certificate of completion after finishing twelfth grade. (R. 20).

The ALJ also noted that, in the claimant's December 2011 functional report, the claimant reported that she was socially active. When asked if she had any problems getting along with family, friends, or neighbors, the claimant responded "no." The claimant did not indicate any limitation in memory, completing tasks, concentration, understanding, following instructions, using hands, or getting along with others. The ALJ further noted that, even after submitting her

18

application, and with previous treatment for depression and anxiety, the claimant did not suggest – via her application, disability, or functional report – any cognitive, intellectual, or emotional limitation. (R. 20-21).

The claimant's attorney sent the claimant to see Dr. Blotchy on January 15, 2013, a few weeks prior to her hearing, for the purpose of evaluation to be used as part of the claim. Dr. Blotchy reported IQ scores indicative of mental retardation and a GAF score that suggested the claimant was unable to function in social or occupational setting. The ALJ noted that the attorney did not send her for actual treatment, and that the record was void of any dedicated mental healthcare prior to or after the evaluation. (R. 23-24).

The ALJ stressed that, up until the point of the evaluation, the claimant had not reported any cognitive or intellectual limitations. The claimant had reported that she could read; she could understand English; she completed high school with a certificate; she possessed a driver's license; and she had a history of unskilled work. The ALJ also noted that the claimant raised three children and no evidence indicated that cognitive or intellectual difficulty limited her success as a mother. The ALJ concluded that the totality of the objective and even subjective evidence prior to the evaluation showed that the claimant enjoyed adaptive functioning "far greater than the scores generated during the evaluation." Accordingly, the ALJ found that Dr. Blotchy's IQ scores were not valid and, having rejected the validity of the scores, further found the claimant did not meet any of those listings, including 12.05(B) and (C). (*Id.*).

At step four, the ALJ found that the claimant had the RFC to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b) with additional limitations. Specifically, the ALJ found that the claimant had the following RFC:

claimant can sit, and/or walk up to six hours each over the course of an eight-hour workday. The claimant can use her upper extremities to frequently lift, carry, push, pull, reach in all directions, handle, finger, and feel up to light weight limitations. The claimant can frequently use her lower extremities to push, pull, and operate foot controls. The claimant cannot climb ladders, ropers or scaffolds. The claimant can occasionally climb stairs. She can frequently climb ramps. She can occasionally balance and crouch. She can frequently stoop and kneel. She cannot crawl. She cannot work in extreme temperatures. She can occasionally work in wetness or humidity. She can occasionally work while subject to vibration. She can frequently work in dusts, odors, fumes, gases, poor ventilation, and other pulmonary irritants. She can occasionally operate a motor vehicle. The claimant possesses the concentration, persistence and pace necessary to understand, remember, and carry out simple one-to-two step instructions in the performance of simple routine and/or repetitive work activity, as well as attend to customary work pressures over the course of a complete eight-hour workday. The claimant is not able to perform math as part of her work activity. The claimant is not able to perform production rate work. The claimant is able to read to the extent necessary to adhere to written warning signs, and other general written guidance. The claimant is not able to perform work activity that requires [other] reading. Instructions should be given orally. The claimant does not require frequent instruction in the performance of work activity consistent with the limitations listed herein. Supervision should be supportive and nonconfrontational. The claimant can frequently work with coworkers; however, interaction should be nonconfrontational and non-intensive. The claimant can occasionally work with the public; however, interaction should be non-confrontational and nonintensive.

(R. 14).

In considering the claimant's subjective symptoms, the ALJ followed a two-step process. As to the subjective limitations of her mental condition, the court finds the record supports the ALJ's decision as discussed earlier in the opinion. As to the claimant's back pain, the ALJ first determined that an underlying medically determinable physical impairment (i.e., degenerative disc disease, as complicated by obesity) existed that could reasonably produce the claimant's

pain or other symptoms. Second, the ALJ evaluated the intensity, persistence, and limiting effects of the claimant's symptoms and determined the extent to which they limit the claimant's functioning. (R. 15).

In consideration of the entire case record, the ALJ found that the claimant's statements about the intensity, persistence, or functionally limiting effects of her back pain were not credible. For instance, the ALJ noted that, neither the history leading up to the alleged onset date nor the actual diagnosis supporting her allegations two-days before the alleged onset date, indicated limitations such that the claimant was in imminent danger of becoming disabled. Furthermore, in her subjective reports to Dr. Boswell, she advised that walking and lifting aggravated her condition. However, the claimant did not indicate any difficulty standing or sitting, and she did not report any additional aggravating factors. Thus, her own subjective reports about the lack of physical limitations were inconsistent with her claim about the intensity and persistence of her pain, and rendered her own statements not credible. (R. 15-16).

The ALJ identified physical examinations that supported his RFC finding. For instance, the ALJ noted that an October 27, 2009 physical examination did not reveal any acute stress; aside from muscle spasms, her examination was unremarkable. A physical examination on November 4, 2009 revealed decreased range of motion in the spine and increased pain with left lateral bending; but she had full motor strength, intact sensation, and negative straight leg testing. During her ER visit in May 2010, the claimant complained of back pain; and an examination showed decreased range of motion in the back, but was otherwise unremarkable. The claimant returned to the ER two months later in July 2010, remarking then that her back pain had just begun three days earlier, indicating that it was intermittent instead of constant. (R. 16-19).

21

The ALJ further noted that the claimant did not receive any additional care until November 2010, with her new treating physician Dr. Boswell. The examinations, two in November 2010, one in March 2011, and the last in April 2011, were either normal or unremarkable aside from occasional lumbar spasms and tenderness. These treatments all occurred within one year of applying for disability. The ALJ then noted that the claimant sought no treatment after Julyl 2011.[7] (R. 19-20).

The ALJ gave Dr. Prevost, one of the treating physicians, some but not great weight on his opinions, because of conflicting medical reports. The ALJ noted that, for instance, Dr. Prevost returned the claimant to full duty in March, 2010, despite his recommendation to apply for disability a few months later. On May 14, 2010, the same day he recommended the claimant to apply for disability, Dr. Prevost also advised his worker's compensation contact that the claimant had no work restrictions.[8]  (R. 16-17).

The ALJ also considered that the January 2, 2012 report from consultative examiner Dr. Jariwala, supported his RFC finding. Dr. Jariwala observed the claimant walk into his office without any difficulty or assistive device. The claimant had normal gait, and her motor, sensory,

---

[7]The ALJ noted the claimant did not seek any treatment after July 2011; however, the record reflects that the claimant's last visit to Dr. Boswell was April 2011 and she sought no treatment afterwards.

[8]Dr. Prevost actually stated in the claimant's medical record that, "I believe that this is probably a pain that is going to prevent her from working. It is probably not related really to the workman's comp and is more related to the degenerative scoliosis and arthritis, at those levels, which has taken years to develop. I recommend that she apply for disability, at least for a period of time, to get her back fixed, because I do not think that we can get her working without getting her back fixed." However, in the Work Duty Slip report, Dr. Prevost noted "no change in work status," from the previous report that said "She is to return to full duty at this time. . . . Her PPI is 5% to the whole person." (R. 432, 465, 477).

and reflex emanations were normal. The claimant had no muscle spasms during that exam; and she was able to walk on her heels and toes, squat, and rise without assistance. The claimant also had full strength in all major muscle groups. Dr. Jariwala diagnosed the claimant with mild to moderate impairment in the lumbosacral spine. The ALJ reasoned that, based on the objective tests of the examination, the ALJ's assessment of mild-to-moderate impairment, and the claimant's medication regimen, Dr. Jariwala's assessment did not indicate limitations greater than the ALJ's RFC finding.  (R. 22-23).

The ALJ stated that he "considered all impairments, severe and nonsevere, in fashioning the claimant's residual functional capacity assessment." Based on that RFC, the ALJ found that the claimant could not perform her past relevant work. (R. 11, 25).

However, applying the Medical Vocational Guidelines as a framework for decision making and considering the testimony of a vocational expert, the ALJ found other jobs exist in the national economy the claimant could perform such as a cleaner/housekeeper (light, unskilled, 19,000 positions in Alabama, 1,000,000 nationally); an agriculture sorter (light, unskilled, 800 positions in Alabama, 33,000 nationally); and a laundry sorter (light, unskilled, 3,000 positions in Alabama, 200,000 nationally). Accordingly, the ALJ found the claimant not disabled at any time from October 26, 2009, her alleged onset date, through the date of the decision (R. 26).

## VI. DISCUSSION

The claimant argues that the ALJ failed to properly address listing 12.05(B) and (C); that the claimant is disabled due to severe back problems; that the ALJ failed to assign proper weight to the opinions and conclusions of Dr. Prevost; and that the ALJ did not properly assess the combination of impairments. To the contrary, this court finds that the ALJ applied the

23

appropriate legal standards to her evaluation of the claimant's subjective complaints and the opinions of her physicians, and that substantial evidence supports the ALJ's decision.

*Issue 1: the Claimant's Alleged Mental Retardation*

The claimant first argues that her impairments met the criteria for Listing 12.05, which concerns intellectual disability. This court disagrees, because the ALJ properly articulated the reasoning behind his decision and substantial evidence supports the ALJ's conclusion that the claimant did not meet or equal the Listing.

The evidentiary standards for presumptive disability under the listings are stricter than for cases that proceed to other steps in the sequential evaluation process because the listings represent an automatic screening based on medical findings rather than an individual judgment based on relevant factors in a claimant's claim. *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990).

The ALJ stated that the claimant had to show that her impairments satisfied the diagnostic description of intellectual disability found in the introductory paragraph of Listing 12.05, together with the criteria in subsection B (a valid IQ score of 69 or less) or C (a valid IQ score of 60 through 70 plus another severe impairment). To be considered for disability benefits under section 12.05, a claimant must at least (1) have significantly subaverage general intellectual functioning; (2) have deficits in adaptive behavior; and (3) have manifested deficits in adaptive behavior before age 22. *Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997).

However, an ALJ may give less weight to an opinion that is inconsistent with or not supported by other evidence in the record. *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1161 (11th Cir. 2004) (noting a one-time examiner's opinion is not entitled to great weight); *see Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) ("a valid I.Q. score need not be

conclusive of mental retardation where the I.Q. score is inconsistent with other evidence in the record on the claimant's daily activities and behavior").

Dr. Blotchy, who examined the claimant at the request of her attorney, identified IQ scores within the 59 to 71 range, with a full scale IQ score of 59. (R. 485). However, the ALJ reasoned that the totality of the evidence reflected those scores were invalid as the claimant's history of adaptive functioning[9] was not consistent with the degree of limitation suggested by Dr. Blotcky's scores. (R. 14, 485).

More specifically, the claimant reported she could drive, shop in stores, watch television, and do daily chores such as laundry, cleaning, cooking. The ALJ noted that, in a pre-hearing form, the only difficulty the claimant reported in handling money was the lack of memory. The ALJ then noted that he took into account that the claimant could raise children as a single mother; that no evidence showed that cognitive or intellectual difficulty limited her success as a mother; and that the plaintiff would get her kids off to school and assist them with homework. (R. 20-21, 25, 57, 64-65, 82, 249-51).

In addition, the ALJ noted that the claimant had a history of unskilled work that included periods of employment of at least one-year in different positions at substantial gainful activity levels; that the claimant testified that she had no difficulty handling her work; the claimant communicated with others by phone or in person every day; the claimant reported no problems getting along with family, friends or neighbors; and that the claimant could go out alone every

---

[9]Adaptive functioning is defined as an "individual's progress in acquiring mental, academic, social and personal skills as compared with other unimpaired individuals of his/her same age." Programs Operation Manual System (POMS) DI 24515.056(D)(2), 2001 WL 1933392.

day. (R. 20-21, 23-24, 55-56, 44-48, 227, 232, 239, 247, 250, 252).

Lastly, the ALJ noted that he also took into account that the claimant did not report any cognitive or intellectual limitations until Dr. Blotcky's evaluation, which her attorney set up shortly before her hearing with the ALJ. Initially, the claimant alleged only that she could not work because of lower back pain and did not report any learning difficulties. In a prehearing function report, the claimant also did not indicate any difficulties with memory, completing tasks, concentration, understanding, following instructions, or getting along with others. In fact, the claimant stated that she could follow both written and spoken instructions well and that she could read and understand English. While the claimant attended special education classes, the ALJ considered that she also completed high school with a certificate. (R. 20-21, 23, 59-60, 84, 252, 255-56).

Accordingly, this court finds that substantial evidence supports the ALJ's finding that Dr. Blotcky's IQ score was not valid and finds that good cause exists for rejecting Dr. Blotcky's opinion. Therefore, this court agrees with the ALJ's conclusion that the claimant did not meet the criteria for Listing 12.05 (B) or (C).

*Issue 2: the Claimant's Back Impairment*

Next, the claimant argues that her back impairments rendered her disabled. However, this court finds that the claimant's back condition did not impose greater limitations than the ALJ's RFC finding and that substantial evidence supports the ALJ's finding that the claimant could perform light work with the postural, environmental, and mental limitations he noted.

The ALJ identified physical examinations that supported his RFC finding. For instance, the ALJ noted that an October 27, 2009 physical examination (the day after the claimant

contends her disability began) did not reveal any acute stress,  aside from muscle spasms, and that her examination was unremarkable; a November 4, 2009 physical examination revealed decreased range of motion in the spine and increased pain with left lateral bending, but she had full motor strength, intact sensation, and negative straight leg raise testing; the claimant visited the ER in May 2010 complaining of back pain, and an examination showed decreased range of motion in the back, but was otherwise unremarkable; the claimant returned to the ER two months later in July 2010, remarking then that her back pain had just begun three days earlier, she again had decreased range of motion and muscle spasms in her back, but normal motor strength and sensation  (R. 16-19, 289, 356-57, 359, 368, 505-06).

While the claimant alleged that her back impairments rendered her disabled, the ALJ properly applied the pain standard and did not find the claimant entirely credible. (R. 16, 25). In evaluating subjective complaints, the ALJ may consider a claimant's method of treatment, a claimant's activities, any measures a claimant takes to relieve symptoms, and any conflicts between a claimant's statements and the rest of the evidence. *Macia v. Bowen*, 829 F.2d 1009, 1012 (11th Cir. 1987) (the ALJ may consider a claimant's daily activities when evaluating her subjective complaints and determining the issue of RFC).

The ALJ properly considered that little evidence suggested any significant impairment leading up to the claimant's alleged October 26, 2009 onset date. Although the claimant reported a history of chronic back pain on October 27, 2009, the day after her alleged onset date, the ALJ observed that her report was inconsistent with her pre-onset date medical records. (R. 15, 16, 367). Specifically, the claimant reported no past medical history of back pain at prior examinations.(R. 15-16, 370, 373, 375, 377, 380). The ALJ also took into account other factors

27

such as Dr. Prevost returning her to work in March 2010, despite her subjective complaints (R. 17, 285); her use of over-the-counter medication to treat her back pain (R. 20, 22, 258); her lack of ER visits during the mid-to-late 2011 to early 2012 period (R. 22); her daily activities described in greater detail earlier (R. 20-22, 62, 82, 247-52); and conflicting statements she made in the record as to how much weight she could lift (R. 21-22, 252, 420).

The ALJ also noted that the claimant did not receive any additional care until November 2010, when she visited her new treating physician Dr. Boswell, who reported either normal or unremarkable results, aside from occasional lumbar spasms and tenderness. Furthermore, the ALJ noted that no record of treatment existed *after* July 2011. (R. 18-20, 382-418).

Therefore, this court finds that substantial evidence supports the ALJ's RFC finding that the claimant had the ability to perform light work with limitations, and that the ALJ properly considered the relevant medical and other evidence in determining the claimant's RFC.

### Issue 3: Weight Assigned to Dr. Prevost

The claimant also argues that the ALJ did not accord proper weight to the opinion of Dr. Prevost, an orthopedic surgeon who examined her as part of a worker's compensation claim. This court finds that the ALJ accorded proper weight to Dr. Prevost's opinion.

The Eleventh Circuit has held that "good cause" exists for discounting a treating physician's opinion when (1) the opinion is not bolstered by the evidence; (2) the evidence supports a contrary finding; or (3) the opinion is conclusory or inconsistent with the doctor's own medical records.  *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997).

The ALJ explained that he did not accord Dr. Prevost's May 2010 disability opinion great weight because it conflicts with other opinions he expressed in the record. The ALJ noted that

Dr. Prevost returned the claimant to full duty on March 2010, despite his recommendation to "apply for disability" a few months later. The ALJ also noted that, more importantly, on May 14, 2010, the same day he recommended the claimant to apply for "disability," Dr. Prevost also advised his worker's compensation contact that the claimant had no work restrictions. (R. 17-18, 24, 284-85, 465, 477). Dr. Prevost's notes and medical reports were inconsistent. Therefore, this court finds that the ALJ identified good cause supported by substantial evidence for not giving Dr. Prevost's opinions great or significant weight.

<i>Issue 4: the Claimant's Impairments in Combination</i>

Lastly, the claimant argues that the ALJ did not consider her impairments in combination. To the contrary, this court finds that the ALJ considered the claimant's impairments combined in finding her not disabled.

The ALJ can satisfy his duty to consider all of the impairments in combination by "stating that he considered whether the claimant suffered from any impairment or combination of impairments." *Id*; *see also Wilson v. Barnhart*, 284 F.3d 1219, 1224-25 (ALJ's decision stating claimant did not have an impairment or combination of impairments that met a listed impairment constituted evidence that the ALJ considered the plaintiff's impairments).

The ALJ's decision reflects that he considered the claimant's impairments in combination in finding the claimant not disabled. The ALJ determined the claimant "does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20. C.F.R. Part 404, Subpart P, Appendix 1." The ALJ also stated that he determined the claimant's RFC "[a]fter careful consideration of the entire record;" that he "considered all symptoms and the extent to which these symptoms [could] reasonably be

29

accepted as consistent with the objective medical evidence and other evidence;" and that he "considered all impairments, severe and nonsevere" (R. 11, 14-15).

Moreover, the ALJ discussed and reviewed the claimant's impairments, both in determining the severity of the claimant's impairments and in determining the claimant's RFC. In particular, the ALJ found that the claimant's obesity, depression, borderline intellectual functioning, and degenerative disc disease as severe impairments. The ALJ also discussed the claimant's back condition, depression, obesity, and intellectual functioning as well as other impairments such as hypertension and anxiety in the decision. In doing so, the ALJ outlined the claimant's medical history and determined that the claimant's impairments, singly or in combination, did not preclude the claimant from performing a range of light work. (R. 10-25).

Accordingly, the record contains no indication that the ALJ erred in his consideration of the claimant's impairments. Therefore, combined with the other issues discussed above, this court affirms the decision of the Commissioner.

## VII. CONCLUSION

For the reasons stated above, this court concludes that the Commissioner applied the correct legal standards and that substantial evidence supports the Commissioner's decision. Accordingly, this court AFFIRMS the decision of the Commissioner. The court will enter a separate order to that effect simultaneously.

DONE and ORDERED this 21st day of March, 2016.

KARON OWEN BOWDRE
CHIEF UNITED STATES DISTRICT JUDGE